## SUPREME COURT.

THE PEOPLE *ex rel.* JAMES R. DELVECHIO agt. THE BOARD OF SUPERVISORS OF THE COUNTY OF KINGS.

An informal and irregular *ballot* of a *board of supervisors* in making the selection and appointment of *two newspapers* for the publication of the session laws in their county, (*Sess. L.* 1845, *p.* 305,) will not vitiate the selection of such papers, where the appointment is otherwise correct.

At all events, a newspaper having received a less number of ballots for such selection, although regular and formal, but not named and included in the resolution of the board designating the two papers having the highest number of ballots, (although informally given,) cannot voluntarily go on and publish the laws, and then seek to compel *payment* therefor by *mandamus* against the board.

*Brooklyn General Term,* *February,* 1862.
EMOTT, BROWN and SCRUGHAM, *Justices.*
DEMURRER to return to alternative mandamus.

P. S. CROOKE, *for the relator.*
R. H. HUNTLEY, *for the defendants.*

BROWN, Justice.    The relator sued out of this court an alternative writ of mandamus directed to the board of supervisors of the county of Kings, commanding them to pay to him the sum of $139.50, claimed to be due to him for publishing in the newspaper known as the Standard, the comptroller's notice of tax sales of lands in the county of Kings, in June, 1861, or to show cause, &c. why the same should not be paid.    The board of supervisors made their return to the writ, answering the material allegations thereof, and denying any legal liability on their part to audit and pay the claim.    To this return the relator put in a demurrer, as not containing any sufficient reason why such claim should not be audited and paid.

The board of supervisors, at their annual meeting on the first Monday of August, 1860, proceeded to designate and appoint two newspapers for publishing the session laws, pursuant to section 3 of the act of 1845, (*Sess. L., p.* 305.) In executing this trust, they doubtless failed to observe the plain directions of the statute, which are, that each member shall designate by ballot one newspaper printed in the county, to publish the laws, and the paper having the highest number of votes, and the paper having the next highest number, shall be the papers designated.    The whole number of ballots cast was 24; of which 22 contained two names, one contained one name, and one was a

blank. Of the double votes, 16 were given for the Daily Eagle, 14 for the Daily Times, 12 for the Evening Star, two for the Brooklyn City News, and one for the Standard, and the ballot with the single name upon it was given for the Standard. Thereupon a resolution was moved and adopted, without opposition, designating and appointing the Brooklyn Daily Eagle and the Brooklyn Daily Times as the newspapers for publishing the laws. In these two papers the comptroller published the notices of the tax sales, and in no other. The publication by the relator, in the Standard, was voluntary, and not at the request or with the assent of the comptroller or of any other officer of the government. The relator assumes that the Standard was one of the papers designated by the board of supervisors, because the only ballot of the whole number cast, which was in conformity with the statute, was given for that paper, thus assuming that it had the highest number of the votes cast. This might be an argument of weight, more or less, to show that no appointment was made of any paper, but it fails to show that the Standard had the highest number of votes, because 22 votes were actually though irregularly given for other newspapers. The board of supervisors are the body designated by law to make the selection, but they certainly did no act at their annual meeting indicating an intention to select the Standard to publish the laws. On the contrary, after a ballot which was doubtless irregular, they immediately passed a unanimous resolution declaring and designating the Eagle and Times as the papers to perform that office. The board of supervisors are the body authorized to appoint; and the manner in which they shall execute the power is directory merely; so that a deviation from the mode, or the omission to observe some of the regulations prescribed in the statute, will not vitiate the appointment. Vide the cases cited on the defendants' points. (*In the matter of Mount Morris Square*, 2 *Hill*, 14; *Striker* agt. *Kelly*, 7

*Hill*, 9 ; *In the matter of the Mohawk and Hudson Railroad Co.*, 19 *Wend.*, 143 ; *The People* agt. *Cook*, 14 *Barb. S. C. R.*, 290, 291, *S. C. 4 Seld.*, 89 ; *The People ex rel. The Supervisors of Chenango*, 4 *Seld.*, 328.) No other sensible rule can be adopted. The appointment or selection of a paper to publish the laws, does not confer a political or corporate office, the title to which could be tried and determined by proceedings in the nature of a *quo warranto;* and the most serious inconveniences must ensue if the designation and selection is held to be void merely from a failure of the appointing body to observe to the letter the regulations prescribed by the statute.

But there is another consideration which effectually disposes of the claim of the relator. This is not an action to try the title to the office, if it could be regarded as one ; nor to test the validity of the comptroller's sales upon notices published in papers not legally selected ; but an application for the prerogative writ of mandamus to compel the payment of a debt which neither the comptroller nor the board of supervisors ever contracted. The services were not rendered at their request, but were voluntarily rendered by the relator, without intimation, recognition or request. There was no express contract, and nothing from which an assumpsit can be implied. I need not refer to authority to show that labor and services voluntarily done for another, without his privity or consent, however meritorious or beneficial to him, affords no ground for an action. The law of implied assumpsit rests upon the principle that there must be a request or an assent of some kind from which the law may infer a promise. These services were not only voluntarily, but needlessly rendered, for the relator well knew that the board of supervisors had selected the Eagle and the Times to do the work, and had failed to select the Standard. Upon no principle to which we have referred, is the relator entitled to the benefit of the writ of

mandamus to compel the payment of the money claimed from the public treasury.

Judgment should be rendered for the defendants.

EMOTT, Justice. The relator has mistaken his course. We cannot in this proceeding go behind the designation or formal act of the supervisors, even if that act or choice was conducted upon wrong principles. If we had been applied to for a mandamus to compel the defendants to designate the relator, there would have been a different question. That would be the question, whether he had received a vote, or that number of votes which entitled him to the office. But we cannot order his account to be paid, because he ought to have been designated, any more than we could award the salary of an office to a man who had never received a certificate of election, nor contested the title of another person who had the certificate, because he ought to have been declared elected.

There should be judgment for the defendants.